UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF NORTH CAROLINA
Case No: 1:11-cv-2

BURTON'S PHARMACY, INC., d/b/a
BURTON'S HEALTH MART PHARMACY;
PIKE'S PHARMACY, INC.; and
DILWORTH DRUGS, LLC, d/b/a
DILWORTH DRUG, for themselves and all
others similarly situated,

                Plaintiffs,

v.

CVS CAREMARK CORPORATION, a
Delaware Corporation; CVS PHARMACY,
INC., a Delaware Corporation; CAREMARK
Rx, LLC, a Delaware Limited Liability
Company; and CAREMARK, LLC, a
California Limited Liability Company,

                Defendants.

**COMPLAINT – CLASS ACTION
JURY TRIAL DEMANDED**

COMES NOW Burton's Pharmacy, Inc., d/b/a Burton's Health Mart Pharmacy, Pike's

Pharmacy, Inc., and Dilworth Drugs, LLC d/b/a Dilworth Drug, for themselves and for all others

similarly situated, and file this Original Complaint and Jury Demand against the above-captioned

Defendants and allege as follows:

## I. NATURE OF THE CASE

1.     Defendants – related corporate entities – each of which is part of an affiliated

group of pharmacies and businesses that are owned by Defendant CVS Caremark Corporation,

are collectively one of the largest pharmacy chains and pharmacy benefit managers in the

country (Defendants are sometimes hereafter referred to collectively as "CVS" or "CVS

Caremark").  CVS Caremark Corporation was formed in 2007 when drug store chain CVS

1

Corporation and pharmacy benefit manager Caremark Rx, Inc., merged to form CVS Caremark Corporation, and became the nation's largest integrated pharmacy services provider.

2.      CVS Caremark is the largest provider of prescriptions in the United States, and fills or manages nearly 1.3 billion prescriptions annually. CVS Caremark ranks as the 18th largest company in the United States (by sales), with nearly $100 billion in sales in 2009. Nearly every retail pharmacy in the country must do business with CVS Caremark (as a pharmacy benefit manager), despite the fact that CVS Caremark's retail stores (CVS pharmacies) are direct competitors to non-CVS pharmacies, including the Plaintiffs and other retail pharmacies across the state of North Carolina.

3.      While the nature and business of retail pharmacies are reasonably well known, a Pharmacy Benefit Manager (sometimes referred to hereafter as a "PBM"), as explained below, administers the prescription drug benefits plan on behalf of plan sponsors (such as companies, unions, and government employers) for health insurance plans that provide a prescription medicine benefit. In the role of PBM, CVS Caremark obtains private information about patients which is then compiled by CVS Caremark to form a complete medical description and prescription history of the patient. CVS Caremark then utilizes this information for its own financial gain to market products and services to (or "to engage") the patients, and otherwise profits on the information by selling it to third parties such as drug companies. Thus, CVS Caremark uses the patient information obtained in the process of filling or managing prescriptions for purposes beyond merely processing prescription claims.

4.      In its required notices of privacy practices under the Health Insurance Portability and Accountability Act ("HIPAA"), CVS Caremark declares that it uses and discloses a person's private health information across all of its affiliated businesses. This information is used, for

2

example, to target and solicit non-CVS patients to bring their prescription drug business to CVS-owned retail stores, and to purchase general merchandise, including lucrative CVS-branded over-the-counter products. CVS Caremark also accepts payments from drug companies for directly marketing to those patients who are likely candidates for a drug because of their prescription history.

5.     CVS Caremark also uses patient information for their own financial gain by creating disincentives for a patient to access the pharmacy of his or her own choice. A patient's ability to select the pharmacy of their choice increases the likelihood that the patient will fill their prescriptions and take their medicine. For that reason, North Carolina enacted a Pharmacy of Choice statute, which ensures that residents of North Carolina who are eligible for reimbursement for pharmacy services as a participant or beneficiary of a health benefit plan shall have the full right to select a pharmacy of their choice when the pharmacy has agreed to participate in the health benefit plan according to the terms offered by the insurer, without imposing a monetary advantage or penalty under a health benefit plan that would affect a beneficiary's choice of pharmacy. The North Carolina Pharmacy of Choice statute further mandates that health service plans remain open to any pharmacy willing to participate in them. Yet in the face of this law, CVS Caremark has established PBM programs such as "Maintenance Choice" that require patients to fill their prescriptions for maintenance medications only at CVS Caremark-owned retail and mail pharmacies or be denied coverage and reimbursement. This is in spite of public assurances by CVS Caremark CEO Tom Ryan, prior to the merger, that "We'll be agnostic [about] where the consumer fills their prescription."

6.     The results are that long-standing pharmacist-patient relationships have been and continue to be disrupted and patients are less likely to fill their prescriptions, which will lead to

3

their poorer health and ultimately increased health care costs for patients and the health care system as a whole.

7.     The practice of CVS Caremark in violating the privacy of patients and unfairly competing with its rivals is well documented.  From 2007 to 2009, the Federal Trade Commission (the "FTC") conducted an investigation into allegations that CVS Caremark discarded patient information improperly such that it would be publicly accessible.  See In the Matter of CVS Caremark Corporation, Case No. 072-3119, in the Federal Trade Commission.  CVS Caremark privacy officer Christine Egan admitted, "We are not safeguarding customer privacy as we are required to do. …It's sad and intolerable."  CVS Caremark entered into a settlement and consent decree as a result and paid a $2.25 million fine to settle a companion investigation by the U.S. Department of Health and Human Services for related Health Information Portability and Accountability Act ("HIPAA") violations.  In 2008, CVS Pharmacy, Inc. paid $315,000.00 to the State of Texas to settle similar allegations.  From 2004 to 2008, 28 different states investigated allegations that Caremark hired itself out to drug companies to target patients to switch to the pharmaceutical maker's drugs.  See, e.g., State of Texas v. Caremark RX LLC, et al., Cause No. D-1-GV-08-320, in the 98th Judicial District Court, Travis County, Texas.  Again, CVS Caremark entered into a consent decree with the states and agreed to pay $22 million to settle the claims.  In spite of the assurances that patient privacy would be protected, as recently as June 13, 2010, it was reported that private patient prescriptions were found blowing in the street outside of a CVS pharmacy in New York City.

8.     On May 4, 2010, CVS Caremark Corporation announced that its business practices were being investigated by a group of 24 states, along with the District of Columbia and Los Angeles County.  This multi-state task force, led by various state Attorneys General, is

4

investigating the relationship and business practices of CVS and Caremark following their 2007

merger. In addition, the company had earlier acknowledged in a filing with the Securities and

Exchange Commission (SEC) that it had received a subpoena from the Office of Inspector

General of the United States Department of Health and Human Services, requiring the company

to provide information regarding the incentives the company provides to customers who transfer

their prescriptions to CVS, including gift cards, goods and other incentives, as well as

investigating "possible false or otherwise improper" claims for Medicare and Medicaid

payments.

9.      CVS Caremark has violated the provisions in the North Carolina Pharmacy of

Choice Act, N.C. Gen. Stat. § 58-51-37, prohibiting any practice that would impose a monetary

advantage or penalty upon plan beneficiaries for utilitizing a willing pharmacy of their own

choice. In the course of this wrongful conduct, Defendants have also violated North Carolina's

Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §75-1.1 et seq. The Plaintiffs bring

this Class Action in redress of those statutory violations and to recover damages for themselves

and all others similarly situated.

## II. PARTIES

10.      Burton's Pharmacy Inc., d/b/a Burton's Health Mart Pharmacy ("Burton's") is an

entity organized and existing under the laws of North Carolina. It operates a retail pharmacy in

Greensboro, North Carolina.

11.      Plaintiff Pike's Pharmacy, Inc. ("Pike's") is an entity organized and existing

under the laws of North Carolina. It operates a retail pharmacy in Charlotte, North Carolina.

12.      Plaintiff Dilworth Drug, LLC, d/b/a Dilworth Drug ("Dilworth Drug") is an entity

organized and existing under the laws of North Carolina. It operates a retail pharmacy in

Charlotte, North Carolina.

13.     Defendant CVS Caremark Corporation is a corporation organized and existing under the laws of the state of Delaware with its principal place of business in the state of Rhode Island.

14.     Defendant CVS Pharmacy, Inc. is a corporation organized and existing under the laws of the state of Rhode Island with its principal place of business in the state of Rhode Island.

15.     Defendant Caremark Rx LLC is a limited liability company organized and existing under the laws of the state of Delaware with it principal place of business in the state of Tennessee.  Caremark Rx's sole member is CVS Pharmacy, Inc.

16.     Defendant Caremark LLC is a limited liability company organized and existing under the laws of the state of California with its principal place of business in the state of Tennessee.  Caremark LLC's sole member is Caremark Rx.  Defendants CVS Caremark Corporation, CVS Pharmacy, Inc., Caremark Rx LLC, and Caremark LLC shall be referred to collectively below as "CVS".

17.     Defendants identified in paragraphs 13 to 16 above will sometimes be referred to collectively as "CVS Caremark" or "CVS."

### III.  JURISDICTION AND VENUE

18.     This Court has personal jurisdiction over each Defendant because, among other things, each regularly does business in North Carolina and the Middle District of North Carolina, and each has voluntarily conducted business in, solicited customers in, and consciously availed themselves of the protection of the laws of this state.  Each Defendant has committed and continues to commit acts in violation of the North Carolina Pharmacy of Choice Act in North Carolina and the North Carolina Unfair and Deceptive Trade Practices Act.

6

19.     This Court has jurisdiction over the claims herein based upon 28 U.S.C. §1332 in that the Defendants are all residents of states other than North Carolina.  This Court also has supplemental jurisdiction over the state law claims herein under 28 U.S.C. §1367.  Further, this Court has subject matter jurisdiction over this class action pursuant to 28 U.S.C. §1332(d), as amended by the Class Action Fairness Act of 2005, because the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

20.     Venue is proper in this Court because each Defendant has one or more agents in and/or transacts business in this district and one of the class representatives resides in this District.

## IV.  BACKGROUND FACTS

### A.     Plaintiffs are Retail Pharmacies

21.     There are more than 60,000 retail pharmacies in the United States with more than 2,500 pharmacy permits on roster in North Carolina as of September 2010.  According to pharmacy permit statistics, 1,219 permits are for in-state retail chain pharmacies, most of which are not CVS; 642 are for independent pharmacies; and some 682 are for various other types of in-state pharmacies such as hospital pharmacies, nursing homes, and health departments.  An additional 403 permits are for out-of-state pharmacies.

22.     Independent retail pharmacies such as Plaintiffs' are essential to the health care delivery system.  Their convenience, pharmacist consultations with patients, and ability to help patients take their medications as prescribed and prevent other health problems deliver remarkable value.  Pharmacies not only represent a significant portion of the United States' health care delivery system but independent pharmacists are also among the most accessible and trusted sources of health care for many patients across the country.  Annually, all retail

7

pharmacies (independents and chains) fill over 3 billion prescriptions across the country. Independent pharmacies dispense 1.4 billion of these prescriptions annually. A single retail pharmacy will dispense an average of 62,379 prescriptions each year (an average of 200 per day). The average independent pharmacy in the United States has $3.8 million in annual sales, 93.3% of which are derived from prescriptions sales.

     **B.**    **Defendants Comprise a Large Operator of Pharmacies and a Large Pharmacy Benefit Manager**

     23.    CVS Caremark's corporate structure is divided into three segments: "Pharmacy Services," "Retail Pharmacy," and "Corporate." The Retail Pharmacy segment operates approximately 7,000 retail CVS pharmacy locations wholly-owned, directly or indirectly, by Defendant CVS Pharmacy, Inc. The Pharmacy Services segment also operates mail-order pharmacies and specialty pharmacies.

     24.    When a consumer fills a prescription at a pharmacy, the pharmacists usually asks whether the consumer has insurance to cover the cost. If there is coverage, the consumer provides the insurance card to the pharmacist. While the pharmacist fills the prescription, sophisticated computer interactions the pharmacy and PBM ensure that the prescription is filled according to the insurance coverage provided by the health plan sponsor. A PBM contracts to provide services in return for fees with self-insuring private and public employers, health plans, labor unions, government agencies, and other entities that provide prescription drug coverage or benefits to enrollees or members, typically employees and their families of a particular company. The consumer usually is unaware of the processing interactions between the pharmacy and the PBM selected by his or her health plan, and the consumer's only additional responsibility is to pick up the filled prescription and pay the pharmacy any co-payment that is due.

8

25.    During these computer interactions, the pharmacy transmits the insurance coverage to the PBM operation, which verifies the insurance and determines if the consumer's insurance plan covers the prescribed drug.  If so, the PBM determines three amounts: [a] any consumer co-payment, [b] how much the PBM will reimburse the pharmacy to dispense the drug, and [c] how much the PBM will bill the plan sponsor for the transaction.

26.    This process, known as "claims adjudication," is handled electronically through the PBM's network of databases.  In this process, the PBM requires that the retail pharmacy supply several pieces of information to the PBM, including the name, address, date of birth, and gender of the patient, as well as the identity of the prescribing physician, the specifics of the prescription medication and dosage, and the identity of the dispensing pharmacy.

27.    CVS Caremark is a PBM which enrolls clients such as private and public employers, health plans, labor unions, and government agencies to administer the prescription medicine benefit those entities provide to enrollees.  CVS Caremark manages the prescription drug benefits of approximately 53 million consumers for at least 2,200 health care plans.

## V.  DEFENDANTS' MISCONDUCT

28.    CVS Caremark uses an information technology ("IT") platform and IT infrastructure that encompasses both its pharmacies and its PBM operations.  This IT infrastructure is thus available to Defendant employees in all their interactions with prescription drug plan beneficiaries and non-Defendant pharmacies, regardless whether the interaction is undertaken by a pharmacist at a retail location, a call-center operator when a beneficiary calls for a prescription, or a mail order clerk at a mail-in pharmacy.  This information includes the name, address, date of birth and gender of the patient; the identity of the patient's prescribing physician(s); the drugs the patient is taking; the patient's prescription drug history; and the

9

pharmacies that have filled prescriptions for the patient. As CVS Caremark Executive Vice-President and Chief Medical Officer, Troy Brennan described CVS' IT infrastructure, known as the "customer engagement engine," on May 15, 2009:

> **[W]hat the customer engagement engine does is it provides this comprehensive view of her [the patient]. So we know what her drug history is, we know her demographics, we know who – what doctors are prescribing for her. We know about her health behavior. We know about her plan design, and that's important… And then we know about her communications preferences. So all the information we have is in one place . . . We're building it into our workflows in the phone centers, in the PBM, at the pharmacists desk in the PBM, in the retail pharmacy, so that everyone can see this information.**

29.     CVS Caremark uses this patient information, acquired by virtue of its parallel PBM operations, to target potential new customers and potential new sales to existing customers that are currently using competing pharmacies such as Plaintiffs'. Defendants use this information to reach out to Plaintiffs' patients by mail, in person, or by phone, and market Defendants' prescription drugs directly to them or their prescribing physician(s). As part of these efforts, CVS Caremark sends the patient a letter after a prescription is filled (whether that prescription is filled at one of the Defendants' own pharmacies or a different pharmacy), as well as timed communications, refill reminders, and even a letter from the applicable Defendant if the patient does not refill his or her prescription at one of the Defendants' pharmacies. Indeed, CVS Caremark pitches to drug manufacturers its own ability to use this process to market prescription drugs to patients.

30.     The information that CVS Caremark (under its PBM umbrella) gathers from individuals includes information that constitutes "individually identifiable health information" within the scope and meaning of the Health Insurance Portability and Accounting Act ("HIPAA"). "Individually identifiable health information" means any information, including

10

demographic information collected from an individual, that—

      **(A)** is created or received by a health care provider, health plan, employer, or health care clearinghouse; and
      **(B)** relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and—
      **(i)** identifies the individual; or
      **(ii)** with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.

42 U.S.C. §1320(6)(d). Individually identifiable health information includes common identifiers such as name, address, social security number, date of birth, or any other information that can be used to identify the individual.

31. On information and belief, CVS Caremark does not have a firewall between its PBM operations and its retail pharmacy operations that would prevent the illicit sharing of non-CVS pharmacy customers' individually identifiable health information between CVS Caremark (as PBM) and CVS Caremark (as retail pharmacy).

32. CVS Caremark purports to justify the disclosure of patients' individually identifiable health information by carefully crafted language included in its Participant Notice of Privacy Practices which reads as follows:

      This Notice of Privacy Practices (the "Notice") describes the privacy practices of CVS Caremark mail and specialty pharmacies ("CVS Caremark"). **CVS Caremark is part of an affiliated group of pharmacies that are owned by CVS Caremark Corporation**. **This affiliated group of pharmacies treats itself as a single entity for purposes of using and disclosing health information about you.** CVS Caremark wants you to know that nothing is more central to our operations than maintaining the privacy of your health information ("Protected Health Information" or "PHI"). PHI is information about you, including basic information that may identify you and relates to your past, present or future health or condition and dispensing of pharmaceutical products to you. We take this responsibility very seriously. [emphasis added].

<u>See</u>, Participant Notice of Privacy Practices, attached hereto as **Exhibit A** and incorporated by

reference.

33.     However, once CVS Caremark obtains a patients' individually identifiable health information pursuant to its PBM function, it misuses the information to target market the pharmacy services of CVS Caremark-owned retail and mail-order pharmacies, as well as to sell its knowledge of the patient population to drug makers so that they may also directly market to the patient population.  As a result, patients – who believe that only their doctor and their chosen pharmacy know their medical condition and the prescriptions they are taking – are receiving various forms of direct marketing from CVS Caremark, implying that the Plaintiffs are behind the marketing campaign.

34.     The marketing services that CVS Caremark sells to drug manufacturers take many forms and fully exploit the various methods CVS Caremark has to "engage the consumer" through the mail, telephone, in-person, or otherwise.  These marketing efforts include various formal and informal programs.  One of the programs is called "Rx C&P," a program by which drug companies pay CVS Caremark to make communications to market drugs to patients and their doctors.  CVS Caremark touts that this "proactive prescription compliance program is based on our understanding of a patient's complete retail and mail service prescription history."  In this program, CVS Caremark sends the patient a letter after a prescription is filled (whether the prescription is filled at a CVS or non-CVS pharmacy), as well as timed communications from CVS Caremark, refill reminders, and even a letter from CVS Caremark if they do not refill their medications.

35.     Another program is called "Rx Review."  In this program, CVS Caremark touts to drug makers that CVS Caremark can directly market to patients and their doctors with messages that can be customized based on a variety of factors including prescribing habits, specialty,

12

diagnosis, and geography.

36.     In addition, when a patient fills his or her prescription at a non-CVS store, CVS directly communicates with the patient, offering an "ExtraCare Health Card" for discounts on over-the-counter products, discounts which are valid only at CVS retail pharmacies or on CVS' website.  This marketing does not in any way relate to CVS Caremark's PBM operation; it is purely for the financial and competitive advantage of CVS Caremark's retail pharmacy subsidiaries, its mail order pharmacies, and its direct consumer services.

37.     The dissemination of patients' individually identifiable health information that is obtained through its function as a PBM – including but not limited to that dissemination to CVS retail pharmacies for purposes of soliciting a customer's business and that dissemination to drug companies so that they can directly market to patients violates HIPAA.  CVS Caremark's position that it "treats itself as a single entity for purposes of using and disclosing health information about" individuals is patently disingenuous.

38.     Despite Defendants' full knowledge of the proprietary and protected nature of this information, as well as their clear understanding of the limited purpose and terms of Plaintiffs' disclosure of such information, they nevertheless unlawfully appropriate, disclose, and misuse the information in order to gain a competitive and financial advantage.  This misconduct by Defendants violates HIPAA regulations, violates the federal antitrust requirements of the CVS-Caremark merger, and constitutes a willful misappropriation of Plaintiffs' proprietary and trade-secret patient lists.

39.     Consistent with and related to this misconduct CVS excludes and/or discriminates against other network pharmacies with respect to filling prescriptions for maintenance medications used to treat chronic health conditions.  Maintenance medications are those drugs

13

taken on a regular basis to treat chronic conditions such as high cholesterol, high blood pressure, or diabetes. Every year, these maintenance medications typically account for the most prescriptions and highest sources of pharmacy revenues. Approximately one-third of Americans take one or more chronic medications (those filled at least three times per year). This one-third of the population accounts for over 90% of all prescriptions filled by retail pharmacies. The list of maintenance medications, as defined above, is long. There are 371 medications on CVS' maintenance medication list, including such top sellers as Lipitor, Nexium, Simvistatin, Plavix, Advair, Diskus, Prevacid, Singulair, Lexapro, Actos, Cymbalta, Crestor, Vytorin, Lisonopril, Metformin, Atenolol, and Enbrel. See, CVS Maintenance Medication List, attached hereto as **Exhibit B** and incorporated by reference. These 371 drugs account for 52 of the top 100 most prescribed medicines in 2008 and 44 of the top 100 prescription medicines in 2008 in terms of dollars spent.

40. The manner in which CVS Caremark restricts a plan beneficiary's choice of pharmacy, and excludes or discriminates against other, non-CVS pharmacies, is by contracting with health insurers and other clients for the right to deny coverage and reimbursement to patients using other than one of its own pharmacies (CVS Pharmacies) for refills of medications after a short period of time, typically somewhere between 30 to 90 days. The vast majority of medications that need to be refilled after that time are maintenance medications, but some are also what are known as acute medications. The CVS Caremark PBM program that requires prescription plan beneficiaries to fill their maintenance prescriptions either through the CVS Caremark mail order pharmacy or at a CVS retail pharmacy is called the "Maintenance Choice" program. This program requires plan members to use either CVS retail or mail order pharmacies to obtain long-term prescriptions after only two refills at the pharmacy of their choice.

14

41.     CVS Caremark is responsible for the creation, design, marketing, implementation, and operation of the "Maintenance Choice" program, which on its face violates the North Carolina Pharmacy of Choice Statute.

42.     For example, CVS Caremark is the PBM for health plan beneficiaries of the City of Charlotte.  According to Page 4 for the maintenance medications rules applicable to the prescription medicine beneficiaries of the City of Charlotte, beneficiaries are required to use CVS Caremark Mail Service pharmacy or to pick up a 90 day supply of maintenance medications at any CVS Retail Pharmacy, for the same copay.  See, City of Charlotte Summary Plan Description, attached hereto as **Exhibit C** and incorporated by reference.  Beneficiaries can get 1 initial (30 day) fill and 2 subsequent (30 day) refills of maintenance medications at any other retail pharmacy that participates in the City of Charlotte's network, but after that the beneficiary must purchase the medications from either CVS Caremark Mail Order or a CVS retail pharmacy.  Otherwise, CVS Caremark will deny coverage of the prescription and the patient is required to pay the entire cost of the prescription out of his or her own pocket with no reimbursement.

43.     As another example, Duke Energy uses CVS Caremark as the PBM for its prescription medicine benefit plan.  The exact same terms apply to those beneficiaries as apply to those for the City of Charlotte.  As the Duke Energy Plan states, "If you do not use one of these methods, after the third fill of your long- term (maintenance) medication, you will pay 100% of the retail price."  See, Duke Energy Prescription Drug Coverage, attached hereto as **Exhibit D** and incorporated by reference.

44.     Still another example, CVS Caremark is the PBM for the prescription medicine benefit plan for US Airways.  The same terms apply to beneficiaries of US Airways.  After 90

15

days, the beneficiary must obtain maintenance medications from CVS Caremark mail order or a CVS retail pharmacy to obtain coverage and reimbursement.  See, CVS Press Release, September 15, 2010, attached hereto as **Exhibit E** and incorporated by reference.

45.     CVS has actually criticized previously exactly the type of program it now employs.  CVS Caremark Corporation Executive Vice-President and President of Pharmacy Services Per Lofberg has stated:

> [T]he mail service model that I have been involved in for almost 20 years now, that model has basically sort of grown, largely in the last decade by putting in benefit designs that are quite disruptive to the members [patients], where they literally cease to have coverage if they go to the retail stores.

See, CVS 2009 Q4 Earnings Call, attached hereto as **Exhibit F** and incorporated by reference.

46.     Similarly, before CVS started engaging in these practices itself, CVS Caremark CEO Tom Ryan stated:

> However, we are opposed to forcing to use a mail order service and then dictating which mail order pharmacy to use.  At best, this practice eliminates patient choice and deprives them of the opportunity to obtain personal consulting from a pharmacist.  At worst, it is unfair and anti-competitive.

See, CVS Press Release, January 9, 2004, attached hereto as **Exhibit G** and incorporated by reference.

47.     One of the goals of CVS Caremark's misconduct is to force patients of non-CVS pharmacies to move all their prescriptions (both maintenance and acute prescriptions) to CVS retail and mail pharmacies.  As David Rickard, then Chief Financial Officer of CVS Caremark stated in 2009: "Any transfer of 30-day CVS scripts to 90-day CVS Caremark scripts is more than offset by our gain in share of non-CVS 30-day maintenance scripts at mail or retail, plus our gain in share from our non-CVS 30-day acute scripts, as people choose to aggregate all their

16

scripts at the most convenient pharmacy."

48.     These policies diminish competition, threaten independent pharmacies, and

ultimately result in higher costs to consumers of pharmacy products and services.

## VI. STATUTORY VIOLATIONS

49.     The Pharmacy of Choice Act, N. C. Gen. Stat. § 58-51-37, states in relevant part:

(a) This section shall apply to all health benefit plans providing pharmaceutical services benefits, including prescription drugs, to any resident of North Carolina. This section shall also apply to insurance companies and health maintenance organizations that provide or administer coverages and benefits for prescription drugs. . . .
(c) The terms of a health benefit plan shall not:
(1) Prohibit or limit a resident of this State, who is eligible for reimbursement for pharmacy services as a participant or beneficiary of a health benefit plan, from selecting a pharmacy of his or her choice when the pharmacy has agreed to participate in the health benefit plan according to the terms offered by the insurer;
(3) Impose upon a beneficiary of pharmacy services under a health benefit plan any copayment, fee, or condition that is not equally imposed upon all beneficiaries in the same benefit category, class, or copayment level under the health benefit plan when receiving services from a contract provider;
(4) Impose a monetary advantage or penalty under a health benefit plan that would affect a beneficiary's choice of pharmacy. Monetary advantage or penalty includes higher copayment, a reduction in reimbursement for services, or promotion of one participating pharmacy over another by these methods;
(5) Reduce allowable reimbursement for pharmacy services to a beneficiary under a health benefit plan because the beneficiary selects a pharmacy of his or her choice, so long as that pharmacy has enrolled with the health benefit plan under the terms offered to all pharmacies in the plan coverage area; or
(6) Require a beneficiary, as a condition of payment or reimbursement, to purchase pharmacy services, including prescription drugs, exclusively through a mail-order pharmacy.

50.     CVS Caremark contracts with health benefit plans in order to act as a PBM.  To

enhance its own profits, CVS Caremark obtains in its agreements with health benefit plans

contractual provisions purportedly allowing them to engage in the conduct alleged herein.  This

conduct constitutes blatant violations of the Pharmacy of Choice Act because CVS Caremark

grants discounts to plan beneficiaries that are not available if the beneficiary selects a competing

17

pharmacy and because CVS Caremark denies coverage and reimbursement for refills of prescriptions after a specified period of time between 30 and 90 days if the beneficiary selects a competing pharmacy of their choice. For most beneficiaries, this "Maintenance Choice" requirement compels them to use CVS Caremark mail-order or CVS retail pharmacies, to the exclusion of the beneficiaries' choice, and to the exclusion of other network pharmacies such as those of the Plaintiffs.

## VII.  CLASS ACTION ALLEGATIONS

51.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 on behalf of the following:  **All retail pharmacies that have operated in North Carolina during the limitations period other than CVS-owned pharmacies.**

52.     The members of the Class are so numerous and geographically dispersed that joinder of all members of the Class would be impracticable.  Members of the Class are located throughout North Carolina.  The exact number of the members of the Class is unknown to Plaintiff at this time, but Plaintiff reasonably believes the Class number exceeds 2,000.

53.     Plaintiffs' claims are typical of the members of the Class.  Plaintiffs and all members of the Class were commonly impacted and damaged by Defendants' wrongful conduct. Plaintiff and the members of the Class were subjected to the loss of revenue that resulted from Defendants' offering discounts and denying coverage to beneficiaries for prescription purchases at Class pharmacies.

54.     Because pharmacies are regulated, the class is readily ascertainable from state permitting data.  The class is also readily ascertainable from Defendants' own records.  Because Defendants serve a substantial proportion of the prescription beneficiaries in North Carolina, they have administered the purchase of drugs from all or virtually all pharmacies in the state.  As

18

alleged above, they keep track of the pharmacies at which beneficiaries fill their prescriptions. Consequently, Defendants' IT infrastructure can easily generate a list of the name and location of every, or nearly every, pharmacy in North Carolina.

55.     Plaintiffs will fairly and adequately protect the interests of the Class.  The interests of Plaintiffs are coincident with, and not antagonistic to, those of the Class.  In addition, Plaintiffs' counsel are experienced and competent in prosecuting complex class action litigation. Plaintiffs and their counsel are committed to prosecuting vigorously this action on behalf of the other members of the Class and have the financial resources to do so.  Neither Plaintiffs nor their counsel have any interest adverse to other members of the Class.

56.     Absent a class action, members of the Class would find the cost of litigating their claims to be prohibitive and will have no effective remedy.

57.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all Class Members is impracticable.  Even if every Class Member could afford individual litigation, the court system could not.  Individual litigation of numerous cases would be unduly burdensome to the courts in which they would proceed.  Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same complex factual issues.  By contrast, conducing this matter as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system, and protects the rights of each Class Member.

58.     Additionally, the prosecution of separate actions by individual Class Members would create a risk of adjudications that would, as a practical matter, dispose of the interests of

19

the other Class Members not parties to such adjudications or that would substantially impair or impede the ability of such nonparty Class Members to protect their interests. The prosecution of individual actions by Class Members also poses the threat of inconsistent results.

59.     The Class has a high degree of cohesion, and prosecution of the action through class representatives would be unobjectionable. Plaintiff is not aware of any other difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

60.     The factual and legal bases of Defendant's liability to Plaintiff and to the Class are the same, resulting in injury to the Plaintiff and to the Class. Plaintiff and the other members of the Class all have suffered harm and damages as a result of Defendants' unlawful and wrongful conduct.

61.     Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members of the Class. Questions of law and fact common to the Classes include, but are not limited to the following:

a.     Whether (and for what health benefit plans providing pharmaceutical services benefits do) Defendants act as PBMs;

b.     Whether those health benefit plans providing pharmaceutical services benefits for which Defendants act as PBMs contain "Maintenance Choice" provisions requiring that maintenance medications (after the first 2 or 3 fills) be purchased only either through CVS Caremark mail-order or CVS retail pharmacies, to the exclusion of the beneficiaries' choice of pharmacy;

c.     Whether Defendants possess IT infrastructure that keeps track of patient

information and displays that information concerning the prescription drug history of the "whole patient" to a wide variety of Defendants' personnel;

d.      Whether Defendants' use that information for purposes of marketing to new and existing beneficiaries of the prescription benefit plans that they administer;

e.      Whether Defendants offer discounts to beneficiaries of the prescription benefit plans that they administer which are not available if the beneficiary purchases from a competing pharmacy;

f.      Whether Defendants deny coverage and reimbursement to beneficiaries of the prescription benefit plans that they administer which are not available if the beneficiary purchases from a competing pharmacy;

g.      Whether Defendants are subject to the Pharmacy of Choice Act;

h.      Whether Defendants violated the Act;

i.      Whether Defendants have aided and abetted violations of the Act;

j.      Whether Defendants' conduct caused harm to the Class;

k.      Whether Defendants' conduct merits a permanent injunction forbidding them violating the Act and remediating the effects of past violations; and

l.      Whether Defendants' conduct and actions constituted unfair and deceptive trade practices under N.C. Gen. Stat. §75-1.1, <u>et seq</u>.

## VIII.  CLAIMS FOR RELIEF

### <u>FIRST CAUSE OF ACTION</u>
### For Violations of N.C. Gen. Stat. §58-51-37

62.      Plaintiffs reallege and incorporate by reference all of the allegations in paragraphs 1 through 61 as if fully set forth herein.

63. N.C. Gen. Stat. §58-51-37 (h) provides, "A violation of this section creates a civil cause of action for damages or injunctive relief in favor of any person or pharmacy aggrieved by the violation." Plaintiffs have suffered damages as a direct result of Defendants' conduct as alleged above. Specifically, patients who previously used and/or would have used Plaintiffs' pharmacies to fill and refill their prescriptions have instead used Defendants' pharmacies to avoid paying higher prices imposed by Defendants' policies. The damages incurred exceed the jurisdictional limits.

64. Plaintiffs also seek permanent injunctive relief prohibiting Defendants' from violating the Pharmacy of Choice Act and specifically prohibiting them from offering any discounts or denying coverage or reimbursements to prescription drug plan beneficiaries on the basis that the beneficiary is using a pharmacy other than one of the Defendants'.

## SECOND CAUSE OF ACTION
### For Violations of the Unfair and Deceptive Trade Practices, N.C. Gen. Stat. §75-1.1, *et seq*.

65. Plaintiffs re-allege and incorporate by reference all of the allegations in paragraphs 1 through 64 as if fully set forth herein.

66. Defendants' actions, as described above, are in or affecting commerce in North Carolina.

67. These actions constitute unfair and deceptive trade practices pursuant to N.C. Gen. Stat. §75-1.1, *et seq*.

68. Plaintiffs have been damaged by Defendants' unfair and deceptive acts in an amount exceeding the jurisdictional limits.

69. Defendants' actions entitle Plaintiffs to treble damages, as well as an award of attorneys' fees incurred in the prosecution of this matter, pursuant to N.C. Gen. Stat.§75-16.1.

## IX. PRAYER

22

**WHEREFORE**, Plaintiffs on behalf of themselves and all other Class Members, pray that this Court adjudge and decree as follows:

1.      That the Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, that Plaintiffs are proper class representatives, and that the best practicable notice of this action be given to members of the Class represented by Plaintiffs;

2.      That it be adjudged and decreed that Defendants have violated the Pharmacy of Choice Act and that Plaintiffs be awarded damages resulting therefrom under a procedure designed to compensate members of the Class for the harm each suffered;

3.      That it be adjudged and decreed that Defendants have violated North Carolina's Unfair and Deceptive Trade Practices Act;

4.      That judgment be entered against the Defendants and in favor of Plaintiffs and the Class on the Causes of Action in this Complaint, for injunctive relief as requested above, and for actual, compensatory, punitive, and treble damages in an amount to be determined at trial;

5.      That judgment be entered imposing interest on damages, litigation costs, and attorneys' fees against the Defendants; and

6.      For all other and further relief as this Court may deem necessary and appropriate. This the 3rd day of January, 2011.

                                    **JACKSON & MCGEE, LLP**

                                    /s/ Gary Jackson
                                    Gary Jackson, NC State Bar No. 13976
                                    Sam McGee, NC State Bar No. 25343
                                    225 E. Worthington Avenue, Suite 200
                                    Charlotte, NC 28203
                                    Telephone: (704) 377-6680
                                    Facsimile: (704) 377-6690

23

**WELLS DAISLEY RABON, P.A.**

/s/ Charles H. Rabon, Jr.
Charles H. Rabon, Jr., NC State Bar No. 16800
1616 Cleveland Avenue
Charlotte, NC 28203
Telephone: (704) 315-2497
Facsimile: (704) 347-0684

**Of Counsel, Pro Hac Vice admissions anticipated**

**GREEN WELLING, P.C.**
Robert S. Green (Cal. Bar No. 136183)
James R. Noblin (Cal. Bar No. 114442)
595 Market Street, Suite 2750
San Francisco, CA 94105
Telephone: (415) 477-6700
Facsimile: (415) 477-6710