IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| BURTON'S PHARMACY, INC., PIKE'S PHARMACY, INC., and DILWORTH DRUGS, LLC, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 1:11CV2 |
| CVS CAREMARK CORPORATION, CVS PHARMACY, INC., CAREMARK RX, LLC, and CAREMARK, LLC, | ) ) ) ) | |
| Defendants. | ) ) | |

MEMORANDUM OPINION AND RECOMMENDATION OF
UNITED STATES MAGISTRATE JUDGE

This matter comes before the Court on a Motion to Dismiss and Compel Arbitration [Doc. #20] filed by Defendants Caremark Rx, LLC, Caremark, LLC, CVS Caremark Corporation, and CVS Pharmacy, Inc. In the Complaint in this case, Plaintiffs allege that Defendants have violated the North Carolina Pharmacy of Choice Act, N.C. Gen. Stat. § 58-51-37 (2012), and that Defendants' actions constitute unfair and deceptive trade practices under North Carolina law, N.C. Gen. Stat. § 75-1.1 (2012). In the present Motion, Defendants contend that these claims are subject to arbitration pursuant to the terms of certain agreements between Plaintiffs and Defendant Caremark LLC. The issues raised in this case parallel those in a similar case brought by several independent retail pharmacies against various CVS entities in the United States District Court for the Southern District of Texas, Muecke Co., Inc. v. CVS Caremark Corp., (S.D. Tx. No. V-10-78). On August 25, 2015, the United States Court of

Appeals for the Fifth Circuit upheld the decision of the district court to compel arbitration as to all of the claims against all of the CVS entities in that case. Muecke Co., Inc. v. CVS Caremark Corp., No. 14-41213, 2015 WL 5010908 (5th Cir. Aug. 25, 2015). That decision likewise relied on a recent decision of the Fifth Circuit in another parallel proceeding in the United States District Court for the Southern District of Mississippi, Crawford Prof'l Drugs, Inc. v. CVS Caremark Corp., 748 F.3d 249 (5th Cir. 2014). For the reasons set forth below, this Court follows the decisions in the Muecke and Crawford cases and recommends that Defendants' Motion to Dismiss and Compel Arbitration be granted to the extent that arbitration be compelled and this action be stayed.[1]

## I.   FACTS, CLAIMS, AND PROCEDURAL HISTORY

Plaintiffs Burton's Pharmacy, Inc. ("Burton's"), Pike's Pharmacy, Inc. ("Pike's"), and Dilworth Drugs, LLC ("Dilworth") are North Carolina retail pharmacies, asserting claims in this case against CVS Caremark Corporation, CVS Pharmacy, Inc., Caremark Rx, LLC, and Caremark, LLC. The Defendants are all related corporate entities,[2] and Plaintiffs contend that following a merger in 2007 between pharmacy benefit plan manager Caremark Rx, Inc. and retail pharmacy chain CVS Corporation, Defendants now collectively represent one of the largest pharmacy chains and pharmacy benefit plan managers in the country.

---

[1] The parties identified the Muecke case as a parallel proceeding in their original briefing and in their supplemental briefing, and the Court has held the present case in abeyance while the parallel issues were litigated in the Muecke and Crawford cases. In light of the resolution of those cases, the Court enters the recommendation in the present case, as set out below.

[2] CVS Caremark Corporation is the sole shareholder of CVS Pharmacy, Inc., and CVS Pharmacy, Inc. is the sole member of Caremark Rx, LLC, which is the sole member of Caremark, LLC.

As alleged in the Complaint, a pharmacy benefit plan manager (PBM) administers prescription drug benefit plans on behalf of plan sponsors (such as companies, unions, and government employers) for health insurance plans that provide a prescription medicine benefit, and in that role the PBM administers various provider networks. In order to participate in certain provider networks, Plaintiffs each entered into Provider Agreements with Defendant Caremark, LLC ("Defendant Caremark" or "Caremark") or its predecessors. These agreements allowed Plaintiffs to participate in Caremark's provider networks. By participating in the provider networks, Plaintiffs could access and fill prescriptions for individuals in pharmacy benefit plans sponsored, administered, or insured by Caremark's clients.

As a pharmacy benefit plan manager, Defendant Caremark obtains and has access to patient health information, including the name, address, date of birth, and gender of the patient; the identity of the prescribing physician; the patient's prescription drug history; and the pharmacies that have filled prescriptions for the patient. Plaintiffs in the present case contend that Defendant Caremark shares this information with its affiliated businesses, and that Defendants use this information to target potential new customers and draw current customers away from pharmacies such as Plaintiffs. In addition, Plaintiffs also allege that Defendants exclude and/or discriminate against other network pharmacies, such as Plaintiffs, with respect to filling prescriptions for maintenance medications used to treat chronic health conditions. For example, Defendants' "Maintenance Choice" program allegedly requires plan members to use either CVS retail or mail order pharmacies to obtain long-term prescriptions after only two refills at the pharmacy of their choice.

Plaintiffs request injunctive and declaratory relief as well as damages for violation of the North Carolina Pharmacy of Choice Act, N.C. Gen. Stat. § 58-51-37,[3] and the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1-1.

In the present motion, Defendant moves to compel arbitration pursuant to the Federal Arbitration Act ("FAA"). That Act provides that:

> A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C.A. § 2 (West 1999 & Supp. 2012). Defendants contend that the Provider Agreements between Plaintiffs and Caremark contain arbitration provisions under the FAA. Defendants further argue that the claims raised by Plaintiffs fall within the scope of these agreements and the arbitration clauses. Therefore, Defendants contend that Plaintiffs should be ordered to arbitrate their disputes and that this court action should be dismissed.

II. DISCUSSION

In order for this Court to compel arbitration, it must first find that an arbitration agreement exists between the parties. Hightower v. GMRI, Inc., 272 F.3d 239, 242 (4th Cir. 2001). If an arbitration agreement exists, the Court must then decide whether the parties'

---

[3] The Act generally prohibits a health benefit plan from limiting a North Carolina resident from selecting a pharmacy of his or her choice when the pharmacy has agreed to participate in the health benefit plan according to the terms offered by the insurer. N.C. Gen. Stat. § 58-51-37(c)(1).

4

dispute falls within the scope of the agreement.  Id.  State law principles governing contract

formation apply in determining whether the parties agreed to arbitrate.  Id.

> A.      Whether Valid Arbitration Agreement Exists

Daniel Pagnillo, the Director of Retail Network Administration for Defendant Caremark,

describes by affidavit the agreements made by the Plaintiffs to join the Caremark network.

Plaintiffs Burton's Pharmacy and Pike's Pharmacy entered into agreements with PCS Health

Systems, Inc., a predecessor to AdvancePCS, which was ultimately acquired by Caremark's

parent company, Caremark Rx, in 2004.  Caremark is the successor to PCS Health Systems's

rights and obligations under the Provider Agreements.  (Pagnillo Decl. [Doc. #22] at 3.)  Copies

of these "Provider Agreements" are attached to his declaration.

Exhibit A to the Pagnillo Declaration is the agreement entered into by Burton's

Pharmacy.  In it, Burton's agrees that Arizona law governs the contract, and that "[a]ny and all

controversies in connection with or arising out of" the agreement will be exclusively settled by

arbitration in accordance with the Rules of the American Arbitration Association.  (Id. at 13

(§§ 9.4, 9.5).)  The contract bears a "received" date of October 23, 1995.  Exhibit B of Mr.

Pagnillo's declaration is the Provider Agreement entered into by Pike's Pharmacy.  It contains

the same choice of law provision and arbitration provision as the Burton's Pharmacy agreement.

(Id. at 27 (§§ 9.4, 9.5).)  The stamped acceptance date for this agreement is not legible.[4]  The

third Plaintiff, Dilworth Drugs, entered into a provider agreement with Caremark, LLC and

---

[4] Mr. Pagnillo attaches as Exhibit D the notice sent to network participants advising that AdvancePCS had acquired PCS Health and that the PCS Provider Agreement would remain in effect.  Exhibit E is a copy of the notice sent to network participants advising that Caremark Rx had acquired AdvancePCS and that the AdvancePCS Provider Agreement would remain in effect.

CaremarkPCS, LLC in 2008, and that agreement is attached to the Pagnillo Declaration as Exhibit C. It too states that the agreement will be construed under Arizona law. (Id. at 36 (§ 13).) The agreement incorporates by reference the Caremark "Provider Manual." (Id. § 11.) This Manual, Exhibit F to the Pagnillo Declaration, includes an arbitration clause mandating that "[a]ny and all disputes in connection with or arising out of" the Provider Agreement will be settled by arbitration in accordance with the Rules of the American Arbitration Association. (Id. at 57.) The Provider Manual also states that "nothing in this provision [the arbitration clause] shall prevent either party from seeking injunctive relief for breach of the Provider Agreement in any state or federal court of law." (Id.)

Plaintiffs do not dispute the existence of these agreements, which each include and/or incorporate arbitration clauses. (Pls.' Opp. [Doc. #28].) Rather, they contend that the clauses are both procedurally and substantively unconscionable and, thus, unenforceable. (Id.) Plaintiffs also argue that if further evidence is necessary to resolve the issues of unconscionability, they should be given the opportunity to conduct limited discovery. (Id.)

As noted above, state law contract principles apply to determine if the contract is enforceable. Hightower, 272 F.3d at 242. In determining the applicable state law, this Court applies the North Carolina choice of law rules. As noted above, the agreements state that they will be construed pursuant to Arizona law. In North Carolina, "[t]he parties' choice of law is generally binding on the interpreting court as long as they had a reasonable basis for their choice and the law of the chosen State does not violate a fundamental policy of the state of otherwise applicable law." Behr v. Behr, 266 S.E.2d 393, 395 (N.C. Ct. App. 1980); see also Cable Tel.

6

Case 1:11-cv-00002-JAB-JEP   Document 71   Filed 09/15/15   Page 6 of 21

Servs., Inc. v. Overland Contracting, Inc., 574 S.E. 2d 31, 33-34 (N.C. Ct. App. 2002). Plaintiffs argue that the parties' choice of law here, Arizona, should not bind this Court because (1) Arizona has no substantial relationship to the parties or transaction, and (2) application of Arizona law would be contrary to a fundamental policy of North Carolina.

With respect to Plaintiffs' argument that Arizona has no substantial relationship to the parties or the transactions at issue, Defendants have proffered that Arizona is the "hub" of Caremark's PBM operations. This is reflected in the Provider Agreements and Provider Manuals. For example, the CVS Provider Manual provides the contact address for Caremark Network Management in Scottsdale, Arizona, and the address for Caremark Part D Medicare Claims Processing is also in Scottsdale. (Provider Manual [Doc. #22-1] at 46, 52.) In response, Plaintiffs' counsel stated during oral argument that he was "not going to contest" defense counsel's representation that Arizona was and is the hub of operations for Caremark PCS, and Plaintiffs' counsel accepted this description and characterization. (Tr. of Jan. 15, 2013 Mot. Hr'g [Doc. #64] at 49.)

Moreover, in considering similar choice of law issues in parallel proceedings against the CVS Defendants in Mississippi, the Court of Appeals for the Fifth Circuit observed that:

> The Defendants . . . note that their business operations are located in Arizona and highlight that the Provider Manual requires the Plaintiffs to (1) direct any inquiries, grievances, or requested changes to Caremark's Scottsdale, Arizona office; (2) dispute a claim or request that a claim be adjusted via Caremark's Scottsdale office; and (3) appeal any audit Caremark conducts to ensure claims accuracy to Caremark's audit manager, located in the company's Scottsdale office. In the absence of evidence to the contrary, we conclude that the Plaintiffs have failed to demonstrate that Arizona "has no substantial relationship to the parties or the transaction [or that] there is no other reasonable basis for the parties' choice."

<u>Crawford</u>, 748 F.3d at 258 (quoting Restatement (Second) of Conflicts of Laws § 187(2)(a)). Likewise in the present case, the Court concludes that Arizona has a substantial relationship to the parties and the transactions at issue, and Plaintiffs have failed to demonstrate otherwise or to point to any need for further inquiry on this point.

Plaintiffs next contend that application of Arizona law would be contrary to a fundamental public policy of North Carolina. On this point, Plaintiffs argue that North Carolina has a strong policy based on the Pharmacy of Choice statute and its Unfair and Deceptive Trade Practices Act. However, Plaintiffs have not attempted to show that application of Arizona law would be contrary to these North Carolina policies. Moreover, North Carolina and Arizona both have general policies favoring arbitration, and it appears that the result would be the same under either state's law. See <u>Westmoreland v. High Point Healthcare Inc.</u>, 721 S.E.2d 712 (N.C. Ct. App. 2012) ("North Carolina has a strong public policy favoring arbitration."); <u>see also</u> <u>Crawford</u>, 748 F.3d at 259 (finding that "Plaintiffs have failed to demonstrate that applying Arizona law in this instance would be contrary to a fundamental public policy of Mississippi"). Accordingly, the Court concludes that North Carolina courts would apply Arizona law to the contracts and to Plaintiffs' arguments of unconscionability.

      1.    Procedural Unconscionability

Plaintiffs first argue that the arbitration clauses are procedurally unconscionable. (Pls.' Opp. [Doc. #28] at 14-16.) Plaintiffs contend that the clauses are procedurally unconscionable because of unequal bargaining power between CVS and themselves, because the contracts are offered on a "take it or leave it" basis, because the arbitration provision is concealed deep within

the lengthy Provider Manual, and because the agreements were signed 16 or 17 years ago with companies now many times removed from Defendant Caremark.

In Arizona, procedural unconscionability is concerned with unfair surprise, fine print clauses, mistakes or ignorance of important facts or other factors which show that bargaining did not occur as it should. <u>Maxwell v. Fidelity Fin. Servs., Inc.</u>, 907 P.2d 51, 57-58 (Ariz. 1995). It "bears a strong resemblance to its 'common-law cousins' of fraud and duress." <u>Id.</u> at 58. To the extent Plaintiffs contend that the Provider Agreements are procedurally unconscionable because of unequal bargaining power or because they were offered on a "take it or leave it" basis, the Court of Appeals for the Fifth Circuit, applying Arizona law, considered similar contentions in a parallel proceeding and found that:

> An adhesion contract is typically a standardized form offered to consumers of goods and services on essentially a 'take it or leave it' basis without affording the consumer a realistic opportunity to bargain and under such conditions that the consumer cannot obtain the desired product or services except by acquiescing in the form contract. For such a contract, [t]he distinctive feature . . . is that the weaker party has no realistic choice as to its terms. However, a conclusion that [a] contract [is] one of adhesion is not, of itself, determinative of its enforceability. Rather, [a] contract of adhesion is fully enforceable[ ] . . . unless the contract is also unduly oppressive or unconscionable. Mere inequality in bargaining power is not sufficient to invalidate an arbitration agreement. Moreover, an agreement may be enforceable even if the terms offered are not negotiable.

<u>Crawford</u>, 748 F.3d at 263 (internal citations and quotations omitted). Here, Plaintiffs do not show that they were prevented from contracting with another PBM or that they could not have abstained from contracting with Defendants at all. Plaintiffs argue that Defendants had far more bargaining power than they had, but fail to discuss how this contributed to any unfair surprise, mistake, or ignorance of important facts.

9

Moreover, the agreements reveal that the arbitration clauses were not hidden or in print different from the other terms of the contract. Although for Plaintiff Dilworth Drugs the clause was contained in the lengthy Provider Manual, for Pike's Pharmacy and Burton's Pharmacy it was also included in the much shorter Provider Agreement. Moreover, to the extent the arbitration clause was included in the Provider Manual for all Plaintiffs, "the arbitration provision is clearly marked, both in the Provider Manual's table of contents and via a boldface heading later in the agreement, and appears in the same font and size as other sections of the parties' agreement." Crawford, 748 F.3d at 265.

Finally, Plaintiffs cite no authority for finding that the agreements are unconscionable because they were entered into many years ago. To the contrary, through those years Plaintiffs were relying upon the contracts to fill the prescriptions of the plan participants. See id. at 266 ("Accordingly, the Plaintiffs' agreement to arbitrate their claims is not procedurally unconscionable simply because they were made sixteen or seventeen years ago."). Plaintiffs have not raised any circumstances that would support a finding of procedural unconscionability.[5]

---

[5] The Court comes to the same conclusion under North Carolina law. See Westmoreland, 721 S.E.2d 712 (finding that a "contract is unconscionable, and therefore unenforceable under equitable principles, only when the inequality of the bargain is so manifest as to shock the judgment of a person of common sense, and where the terms are so oppressive that no reasonable person would make them on the one hand, and no honest and fair person would accept them on the other," and noting that "[p]rocedural unconscionability involves 'bargaining naughtiness' in the form of unfair surprise, lack of meaningful choice, and an inequality of bargaining power" but "bargaining inequality alone generally cannot establish procedural unconscionability" (internal quotations omitted)).

2.      Substantive Unconscionability

Substantive unconscionability under Arizona law "concerns the actual terms of the contract and examines the relative fairness of the obligations assumed." Maxwell, 907 P.2d at 58. Indicators of substantive unconscionability include terms so one-sided as to oppress or unfairly surprise an innocent party, an overall imbalance in the obligations and rights imposed, and significant cost-price disparity. Id. With respect to substantive unconscionability in this case, Plaintiffs first argue that the bar on class actions contained within the agreements demonstrates substantive unconscionability. However, the Supreme Court has rejected this argument in AT&T Mobility LLC v. Concepcion, 131 S. Ct. 1740 (2011) and American Exp. Co. v. Italian Colors Restaurant, 133 S. Ct. 2304, 2308 (2013). Therefore, the Court cannot find that the bar on class actions demonstrates unconscionability of Plaintiffs' agreements.

Plaintiffs also contend that the agreements are unconscionable because the agreements require the arbitration to be held in Arizona. As discussed above, this location bears a substantial relationship to Defendant Caremark and to the transactions at issue. Furthermore, Plaintiffs fail to discuss or provide any support for the proposition that arbitrating in Arizona places an unreasonable burden upon them. Plaintiffs also argue that they will be unable to employ counsel to arbitrate their claims. They have submitted an affidavit from Attorney Michael G. Wimer in Asheville, N.C., who concludes that the "economic realities of this case dictate that it proceed as a class action or not at all." (Pls.' Opp. [Doc. #28-5] at 2.) To the extent that this contention again raises the unavailability of class relief, that argument does not support a finding of unconscionability, as noted above. In addition, Plaintiffs generally contend

11

that the cost of arbitration supports a finding of unconscionability, but have failed to provide

supporting information such as the "specific financial status" of the Plaintiffs, an estimation of

the amount of money at stake for each Plaintiff, and the total amount of costs at issue. Adkins

v. Labor Ready, Inc., 303 F.3d 496, 503 (4th Cir. 2002); see also Green Tree Fin. Corp.–Alabama

v. Randolph, 531 U.S. 79, 92 (2000) (party seeking to avoid arbitration because it is prohibitively

expensive bears burden of showing the likelihood of incurring such costs).

Moreover, the Court of Appeals for the Fifth Circuit considered and rejected similar

claims of unconscionability under Arizona law:

> The Plaintiffs argue that the costs of arbitration render their agreements to
> arbitrate substantively unconscionable because (1) they will not be able to afford
> travel for themselves, their attorneys, and any witnesses from Mississippi to
> Scottsdale, Arizona, and (2) they risk the possibility of having to pay costs and
> attorneys' fees in the event that the arbitrator sides with the Defendants.
> . . . .
> In this case, the Plaintiffs failed to present any specific, individualized evidence
> that they were likely to face prohibitive costs if forced to arbitrate their underlying
> claims. More fundamentally, the Plaintiffs' contention that they will not prevail
> before the arbitrator and will therefore have to bear costs and attorneys' fees is
> speculative and conclusory at best. Lastly, although not briefed by the parties,
> Arizona courts have noted that the AAA Rules provide for the waiver or
> reduction of fees based on "extreme hardship." Given this, the Plaintiffs' burden
> of proof, and the Plaintiffs' failure to point to any record evidence detailing what
> it will cost to travel to Arizona, who will be traveling, and how much costs will
> be, we conclude that the potential costs of arbitration do not render the
> arbitration clause substantively unconscionable.

Crawford, 748 F.3d at 267.

Plaintiffs also argue that the agreements unreasonably limit the arbitrator's ability to

award statutory damages, including the possible treble damages available under the North

Carolina Unfair and Deceptive Trade Practices statute. By their terms, the agreements limit

12

remedies to those provided for in the Provider Agreement. However, Plaintiffs do not explain how that results in their statutory damages being limited. Again, the party resisting arbitration has the burden of proving their defense to the enforcement of the arbitration agreement. <u>Green Tree</u>, 531 U.S. at 92. Plaintiffs have not carried their burden. <u>See</u> <u>Crawford</u>, 748 F.3d at 266-67. Accordingly, none of Plaintiffs' arguments for substantive unconscionability are persuasive.[6]

The Court finds that the arbitration clauses in Plaintiffs' agreements are valid and binding upon them.[7] The next inquiry is, therefore, whether Plaintiffs' claims fall within the scope of their agreement to arbitrate.

## B. Scope of the Arbitration Clauses

Plaintiffs' counsel conceded at oral argument that "it's difficult to argue that these matters are not within the scope" of the arbitration clauses at issue. (Tr. of Jan. 15, 2013 Mot. Hr'g [Doc. #64] at 59.) The Court agrees.

---

[6] Plaintiffs argue that they should be given the opportunity to conduct discovery if the Court determines that additional evidence is necessary to resolve the issues of unconscionability. (Pls.' Opp. [Doc. #28] at 17.) Plaintiffs have not, however, identified in their briefing any specific issues upon which discovery would be helpful. At oral argument, Plaintiffs' counsel suggested that discovery might be helpful on the issues of whether Defendant Caremark has ever negotiated terms of the Provider Agreements, how many individual arbitrations involving consciconability issues have been commenced, and the cost of arbitration. (Tr. [Doc. #64] at 60.) To the extent that Plaintiffs seek discovery with respect to information they possess or could obtain themselves, that request is unavailing. <u>See, e.g.</u>, <u>Adkins</u>, 303 F.3d at 503 (noting that the plaintiff "does not even provide any evidence about the most basic element of this challenge: the size of the allegedly 'prohibitive' arbitration fee itself. Adkins' plea that he could not do this because the district court cut off discovery is unconvincing. It was within his power to obtain this information by simply investigating the option of arbitration in the first place. He cannot seriously claim to be in court because the arbitration fee is too high at the same time that he pleads ignorance about what the actual amount of the arbitration fee might be."). Moreover, the Court finds that discovery on those issues would not affect the Court's decision, and there is no basis for conducting discovery in this regard.

[7] The Court comes to the same conclusion under North Carolina law. <u>See</u> <u>Westmoreland</u>, 721 S.E. 2d at 721-22; <u>Torrence v. Nationwide Budget Fin.</u>, 753 S.E. 2d 802 (N.C. Ct. App. 2014); <u>see also</u> <u>Lacy v. EMC Mortg. Corp.</u>, No. 5:10CV173, 2011 WL 1337424 (W.D.N.C. Apr. 7, 2011) (provision limiting damages not unconscionable because it holds parties to same standard).

13

The Court notes first that Defendants contend that the determination of the scope of the arbitration clauses is a question for the arbitrator, not the Court, based on the provision of the arbitration clause that expressly incorporates the Rules of the American Arbitration Association. In this regard, Defendants note that by incorporating the AAA Rules, the parties' signified their agreement that the arbitrator, rather than the court, must determine arbitrability of the dispute, since the AAA Rules provide that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." Contec Corp. v. Remote Solution Co., 398 F.3d 205, 210-11 (2d Cir. 2005); See also Fallo v. High-Tech Inst., 559 F.3d 874, 878-80 (8th Cir. 2009). The Court of Appeals for the Fifth Circuit adopted this approach in Crawford:

> Ordinarily, whether a claim is subject to arbitration is a question for a court. . . . However, if the parties have clearly and unmistakably agreed to arbitrate arbitrability, certain threshold questions—such as whether a particular claim is subject to arbitration—are for the arbitrator, and not a court, to decide. . . . In this case, we conclude that this standard has been satisfied and that, consequently, the Plaintiffs must submit this argument to the arbitrator in the first instance.

> It is undisputed that each Plaintiff is a party to a Provider Agreement with Caremark or CaremarkPCS. The Provider Agreement, incorporating the Provider Manual by reference, includes an arbitration clause, pursuant to which the Plaintiffs agreed to arbitrate "[a]ny and all disputes in connection with or arising out of the Provider Agreement ... before a single arbitrator in accordance with the Rules of the American Arbitration Association" ("the AAA Rules"). The AAA Rules for commercial arbitration include Rule 7, which provides that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." In Petrofac, Inc. v. DynMcDermott Petroleum Operations Co., we concluded that express incorporation of the same AAA Rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability. 687 F.3d 671, 675 (5th Cir. 2012) (collecting cases). Accordingly, there is clear and unmistakable evidence that the parties to the Provider Agreement agreed to arbitrate

14

arbitrability, and so we conclude that whether the Plaintiffs' claims are subject to arbitration must be decided in the first instance by the arbitrator, not a court.

<u>Crawford</u>, 748 F.3d at 262-63. Similarly in the present case, the agreement reflects that the parties agreed that questions regarding the scope of the arbitration clause would be for the arbitrator rather than the Court.

Moreover, even if the Court were to consider the question directly, the claims raised in this case are within the scope of the arbitration clauses. The arbitration clauses at issue in the present action provide that "[a]ny and all disputes in connection with or arising out of" the Provider Agreement will be settled by arbitration. This is a "broad" arbitration clause. <u>See Prima Paint Corp. v. Flood & Conklin Mfg. Co.</u>, 388 U.S. 395, 398 (1967) (labeling as "broad" a clause that required arbitration of "[a]ny controversy or claim arising out of or relating to this Agreement"); <u>Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.</u>, 96 F.3d 88, 93 (4th Cir. 1996) (noting that agreement to arbitrate any dispute that "arose out of or related to" agreement is broad); <u>J.J. Ryan & Sons v. Rhone Poulenc Textile, S.A.</u>, 863 F.2d 315, 321 (4th Cir. 1988) (finding that the scope of a clause requiring that "all disputes arising in connection with" the contract be arbitrated was identical to that of a clause providing for the arbitrability of disputes that "may arise out of or in relation to" an agreement, and encompass a "broad scope" of arbitrable issues). The broad arbitration clauses here at issue are therefore "capable of an expansive reach." <u>Am. Recovery</u>, 96 F.3d at 93. The arbitration agreements include claims not only arising out of the Plaintiffs' agreements but also claims that are "connected with" those agreements. Put another way, the arbitration agreements embrace "every dispute between the

15

parties having a significant relationship to the contract regardless of the label attached to the dispute." J.J. Ryan, 863 F.2d at 321.

In the present action, all of Plaintiffs' claims have a connection with or significant relationship to their Provider Agreements. In contending that their claims fall outside the scope of their arbitration agreements, Plaintiffs first argue that Defendants' exclusion of reimbursements for prescriptions of a network participant filled at non-CVS pharmacies is not significantly related to their Provider Agreements. (Pls.' Opp. [Doc. #28] at 7-8). However, without a Provider Agreement with Defendants, Plaintiffs would not be able to participate in any Caremark network. Moreover, their Provider Agreements control which networks they may participate in and provide that Caremark may establish networks in which not all providers may participate. (Provider Agreement [Doc. #22] at 35, ¶ 5 (setting out networks in which providers are allowed to participate); Provider Manual [Doc. #22-1] at 21 ("Caremark may make available to the provider the opportunity to participate in Caremark or Plan Sponsor networks").) Therefore, there is a significant relationship between the networks that Plaintiffs are allowed to participate in and their Provider Agreements.

Plaintiffs next contend that Defendants' use or abuse of patient or prescription information is not significantly related to their Provider Agreements. (Pls.' Opp. [Doc. #28] at 8.) However, the information provided to Defendants by Plaintiffs is submitted to Defendants because of their Provider Agreements. The Provider Agreements and incorporated manual specifically address the ownership and use of this data. (Provider Manual [Doc. #22] at 45-50,

16

56; [Doc. #22-1] at 15-16, 36, 44.) Accordingly, data use has a significant relationship to the Provider Agreements.

For these reasons, Plaintiffs' claims fall within the scope of their agreements to arbitrate.

C.     Non-signatory Defendants

Plaintiffs next contend that Defendants CVS Caremark Corp., CVS Pharmacy, and Caremark Rx are separate entities that are not a party to the Provider Agreements and may not rely upon the arbitration clauses to force arbitration of the claims against them. In response, these "non-signatory" Defendants contend that they are entitled to enforce the arbitration clauses under principles of equitable estoppel. See Arthur Andersen LLP v. Carlisle, 556 U.S. 624, 631 (2009) (recognizing that "'traditional principles' of state law allow a contract to be enforced by or against nonparties to the contract through . . . 'estoppel'" (quoting 21 R. Lord, Williston on Contract § 57:19, p. 183 (4th ed. 2001)). Resolution of this issue has been a matter of extended litigation in the parallel cases, but has now been resolved in the recent decisions of the Court of Appeals for the Fifth Circuit in Crawford and in Meucke Co., Inc. v. CVS Caremark Corp., 2015 WL 5010908 (5th Cir. Aug. 25, 2015). Applying Arizona law, the Fifth Circuit in Crawford held that:

> On review of the facts of this case and the Plaintiffs' allegations, we conclude that California's test for arbitration by estoppel—which informs our Erie guess whether Arizona would adopt such a test—is satisfied because the Plaintiffs' "claims against the nonsignatory [Defendants] are founded in and inextricably bound up with the obligations imposed by the agreement containing the arbitration clause." . . . . The Plaintiffs' trade-secret misappropriation claim, for instance, alleges that the Defendants misused patient and prescription information. However, this information would not have been provided but for the Plaintiffs' participation in the Defendants' PBM network pursuant to the Provider Agreement. In order to prevail, the Plaintiffs must establish, inter alia,

17

that the Defendants acquired the trade secret "through a breach of a confidential relationship or discovered by improper means." . . . . In their complaint, the Plaintiffs allege that they voluntarily provided the relevant information to the Defendants and so, to prevail, they must demonstrate that the Defendants exceeded the scope of their permitted use of this information. However, the Provider Manual, which the Provider Agreement incorporates by reference, states that the disclosed patient and prescription information "is the property of Caremark, and [each Plaintiff] agrees not to claim any right, title, or interest in [the] information." The Provider Manual further states that "Caremark has the right to use, reproduce, and adapt any information or data obtained from Provider in any manner deemed appropriate, even if such use is outside the scope of the Provider Agreement, provided such use is in accordance with applicable Law."

The Plaintiffs further allege that they were denied access to and participation in the Defendants' PBM network. However, the Provider Agreement governs the PBM networks in which the Plaintiffs may participate as well as the terms of and eligibility to participate in Caremark's various networks. As such, the Plaintiffs' "claims against the nonsignatory [Defendants] are founded in and inextricably bound up with the obligations imposed by the agreement containing the arbitration clause." . . . . Accordingly, because <u>Schoneberger</u> suggests that Arizona courts would likely accept an arbitration-by-estoppel theory, we believe that Arizona law, as informed by apposite and well reasoned California law, would permit the non-signatory Defendants to compel the signatory Plaintiffs to arbitrate their claims.

<u>Crawford</u>, 748 F.3d at 260-61. Further, on August 25, 2015, in reversing a prior contrary conclusion in <u>Muecke</u>, <u>see</u> <u>Muecke Co., Inc. v. CVS Caremark Corp.</u>, No. 12-40475, 2013 WL 586907 (5th Cir. Feb. 11, 2013), the Fifth Circuit upheld the district court's order on reconsideration and held that:

The <u>Crawford</u> analysis, discussed at length above, leads to the conclusion that the non-signatory defendants here may compel arbitration under the equitable estoppel doctrine because the elements for the plaintiffs' claims are bound up with the provider agreements. See <u>Crawford</u>, 748 F.3d at 261. The district court correctly concluded that liability for a Texas trade secret misappropriation claim arises when trade secrets are obtained through improper means or disclosed or used in a manner that breaches confidence. . . . . The only way to determine how the defendants received the information and the manner in which they were

18

allowed to use it is by referring to the provider agreements. Those claims therefore are bound up with the provider agreements. See Crawford, 748 F.3d at 261. As a result, under Crawford, the district court did not err in granting the non-signatory defendants' motion to compel arbitration.

. . . . Equitable estoppel is based on the premise that "[o]ne should not be permitted to rely on an agreement containing an arbitration clause for its claims, while at the same time repudiating the arbitration provision contained in the same contract." Id. at 260 (citation and quotation marks omitted). . . . Equitable estoppel recognizes that a non-signatory to the provider agreements would not be able to exercise rights to compel arbitration but for the opposing party's use of the contract for its claims. Because the plaintiffs are suing the defendants as if the defendants were parties to the contract, the plaintiffs cannot then claim the defendants are not parties to other portions of the contract.

Muecke, 2015 WL 5010908 at *5; see also CVS Pharmacy, Inc. v. Gable Family Pharmacy, No. 12CV1057 (D. Az. Oct. 19, 2012) (finding that under Arizona law the pharmacies were equitably estopped from refusing to arbitrate their claims of misappropriation of trade secrets against CVS corporate entities who were nonsignatories to the Provider Agreements).

Likewise in the present case, equitable estoppel applies to require Plaintiffs to arbitrate their claims as to all of the Defendants. Plaintiffs refer to Defendants collectively in their claims for relief without differentiating between them in any way, and thus allege concerted conduct by Defendants as a group. (Compl. [Doc. #1].) In addition, because Plaintiffs' Provider Agreements govern the use of the information submitted by Plaintiffs to Defendants, Plaintiffs' claims of misuse of the information must rely upon the terms of their Provider Agreements. Plaintiffs also must rely upon the terms of their Provider Agreements for their claims that Defendants discriminate against some network pharmacies because their agreements determine to which networks Plaintiffs belong. Plaintiffs in this action, by suing Defendants for misuse of the data covered by their Provider Agreements and for discrimination against network

19

pharmacies also covered by their Provider Agreements, bring claims that are bound up with the Provider Agreements. Therefore, under Arizona law, equitable estoppel is appropriate against Plaintiffs.[8]

### D. Injunctive Relief

Finally, Plaintiffs argue that the arbitration clauses do not apply to their claims for injunctive relief. Plaintiffs rely upon the language in the Provider Manual which states that "nothing in this provision [governing arbitration] shall prevent either party from seeking injunctive relief for breach of this Provider Agreement in any state or federal court of law." (Provider Manual [Doc. #22] at 57.) Defendants argue that this provision does not apply to Plaintiffs' claim for injunctive relief because Plaintiffs have not alleged a breach of the Provider Agreement.

Plaintiffs have not explained how they have alleged a breach of the Provider Agreement. Plaintiffs instead argue that this clause may be read to allow them to seek injunctive relief on a basis other than breach of the Provider Agreement. (Pls.' Opp. [Doc. #28] at 10.) In considering this contention, the Court agrees that the clause does not prohibit Plaintiffs from seeking injunctive relief on a basis other than breach of the Provider Agreement. However, there is no exception to arbitrating such a dispute. The only exception to arbitration is for claims for injunctive relief "for breach of this Provider Agreement." See Crawford Prof'l Drugs, Inc. v. CVS Caremark Corp., No. 12CV114 (S.D. Miss. Oct. 24, 2012) (unpublished) (finding claims for injunctive relief subject to arbitration because identical provision applied only

---

[8] The result is the same under North Carolina law. See Carter v. TD Ameritrade Holding Corp., 721 S.E.2d 256 (N.C. Ct. App. 2012).

"when a party to the contract seeks injunctive relief to remedy a breach of the contract."); see also MedfusionRX, LLC v. Aetna Life Ins. Co., No. 3:12CV567 (S.D. Miss. Dec. 21, 2012) (unpublished) (finding claims for injunctive relief based on Mississippi "any willing provider" statute subject to arbitration based on identical provision in Caremark Provider Manual). Therefore, there is no merit to Plaintiffs' argument that the arbitration clauses do not apply to their claims for injunctive relief in this case.

      E.      Dismissal or Stay of this Action

      Defendants' Motion seeks dismissal of this action.  In Hooters of Am., Inc. v. Phillips, 173 F.3d 933 (4th Cir. 1999), the Fourth Circuit stated that "[w]hen a valid agreement to arbitrate exists between the parties and covers the matter in dispute, the FAA commands the federal courts to stay any ongoing judicial proceeding . . . and to compel arbitration."  173 F.3d at 937 (citations omitted).  Accordingly, the Court recommends that this action be stayed while the arbitration proceeds.

III.    CONCLUSION

      IT IS THEREFORE RECOMMENDED that Defendants' Motion to Dismiss or to Compel Arbitration [Doc. #20] be granted to the extent that this matter be ordered to arbitration, that this action be stayed pending that arbitration, and that the Clerk's Office be directed to administratively close this case, without prejudice to either party moving to reopen the proceedings as appropriate during or at the conclusion of the arbitration.

      This, the 15th day of September, 2015.

                                          /s/ Joi Elizabeth Peake
                                    United States Magistrate Judge